(No. 32855.—

HAYES FREIGHT LINES, INC., Appellant, *vs.* LATHAM CASTLE, Attorney General, *et al.,* Appellees.

*Opinion filed January 20, 1954.*

AXELROD, GOODMAN & STEINER, of Chicago, for appellant.

LATHAM CASTLE, Attorney General, of Springfield, (JOHN L. DAVIDSON, JR., WILLIAM C. WINES, MARK O. ROBERTS, and LEE D. MARTIN, of counsel,) for appellees.

Mr. CHIEF JUSTICE SCHAEFER delivered the opinion of the court:

Section 132.02 of the Uniform Act Regulating Traffic on Highways (Ill. Rev. Stat. 1951, chap. 95½, par. 229b,) provides for suspension of the privilege of operating a commercial vehicle upon the highways when habitual operation in violation of the maximum weight and load limits fixed by section 131 of the act (Ill. Rev. Stat. 1951, chap. 95½, par. 228,) is established. Plaintiff filed a complaint in the circuit court of Marion County in which it alleged that an action had been brought in that court charging plaintiff with 157 violations of section 131, and seeking to suspend its commercial operator's privilege for ninety days. On information and belief, plaintiff also alleged that a second such action was about to be instituted to suspend its privilege for either ninety days or one year because of 144 additional violations. Asserting that the suspension provisions violate the State and Federal constitutions in

respects which will be discussed, plaintiff sought a declaratory judgment that they are invalid, and an injunction to restrain the defendants, the Attorney General and the State's Attorney of Marion County, from proceeding further against the plaintiff. The circuit court found the suspension provisions valid, granted defendants' motion to dismiss the complaint, and entered an order of dismissal against the plaintiff, who appeals directly to this court.

The complaint alleges that the plaintiff is a corporation engaged in the transportation of property by motor vehicle as a common carrier, both in interstate and intrastate commerce. It operates 1929 motor vehicles, employs 2059 persons, of whom 736 are utilized in its Illinois operations, and maintains terminals at thirty-five cities in eight States. It conducts interstate operations in ten States, including Illinois, under a certificate of public convenience and necessity issued to it by the Interstate Commerce Commission. It also operates in intrastate commerce within Illinois as a line-haul carrier, pursuant to a certificate of public convenience and necessity issued by the Division of Motor Carriers of the Department of Public Works and Buildings.

It is also alleged that during the time covered by the complaint in the suspension proceeding, plaintiff's vehicles operated approximately 60,000 vehicle trips over the highways of the State, traveling a total of 90,000,000 miles, and transporting daily 7,500,000 pounds of property, and that only two of the 157 violations charged involved "gross" overloads, as distinguished from "axle" overloads resulting from the shift of cargo during the course of operation of the vehicles.

Plaintiff further alleges that its business as a common carrier constitutes a valuable property right which requires, for its continuous existence, that a regular and uninterrupted service both in interstate and in intrastate commerce be performed, and that a suspension of its service for either ninety days or one year may result in financial ruin.

Section 132.02 alone is attacked here. Plaintiff concedes the validity of section 131, and of section 132.01 (Ill. Rev. Stat. 1951, chap. 95½, par. 229a,) which provides a schedule of fines, graduated according to the amount of excess weight, for violation of section 131.

Subsection (b) of section 132.02, which was added to the act in 1951, provides that the privilege of a commercial vehicle operator to operate upon the highways shall be suspended when he shall "habitually operate" in violation of the maximum load and weight limits of section 131. The "commercial vehicle operator's privilege" is defined by section 132.02(a)(3) as "the privilege, recognized or conferred by any law of this state, of any person * * * to operate * * * commercial vehicles * * * upon the public highways of this state." Section 132.02(c) provides that upon conviction of any person for a violation of section 131 the arresting officer shall report the circumstances of the arrest to the Director of the Department of Public Safety, who is required to mail a copy of the report to the person in whose name the offending vehicle is registered. Section 132.02(d) provides that the Director of the Department of Public Safety shall notify the Attorney General whenever a total of ten convictions has been entered during any twelve months' period with respect to vehicles operated by any one operator. It then becomes the duty of the Attorney General to bring a proceeding to suspend the operator's privilege. By subsection (e), the circuit courts and the superior court of Cook County are given jurisdiction of suspension proceedings.

Subsection (g) provides that proof of a total of ten or more convictions for violation of section 131 during any twelve months' period by any one operator constitutes *prima facie* evidence that the operator has habitually operated in violation of section 131. Subsection (g) further provides that "the court shall not find that a defendant has habitually operated one or more commercial vehicles in violation of

Section 131 of this Act unless and until the court shall have considered the evidence to the contrary, if any, offered by the defendant, and such evidence may include, but shall not be limited to, evidence relating to the character and gravity of such violations and the extent of the operations of commercial vehicles by or on behalf of such defendant upon the public highways of this state which did not involve any such violations."

Subsection (i) provides that whenever the court shall find from the evidence that an operator has habitually operated one or more commercial vehicles in violation of section 131, it shall enter an order suspending the operator's privilege for a period of ninety days. If at any time thereafter, in another suspension proceeding, the court shall find that the operator has again habitually operated in violation of section 131, it shall enter a similar order of suspension for a period of one year. An order of suspension is enforceable by contempt proceedings, (subsection (j),) and operation after suspension is a misdemeanor (subsection (1).)

The plaintiff contends that section 132.02 is invalid under the Federal and State constitutions. The Federal grounds relied upon are the due process, equal protection, commerce and supremacy clauses. The State grounds are the due process and separation of powers clauses, and the requirement of section 11 of article II that all penalties be proportioned to the offense. We shall defer consideration of the contentions raised under the commerce and supremacy clauses of the Federal constitution until the other issues have been discussed.

Statutory provisions for suspension or revocation of licenses of all types upon proof of violation of law are so familiar as not to warrant citation. In the motor vehicle field, the Illinois provision for revocation of the ordinary driver's license for specified statutory violations (among them three convictions for violation of speed limits) (Ill.

Rev. Stat. 1951, chap. 95½, par. 35j,) is typical of provisions which are uniformly regarded as permissible regulations of the use of the highways. (*People* v. *Kobylak,* 383 Ill. 432; *In Re Probasco,* 269 Mich. 453, 257 N.W. 861; *Commonwealth* v. *Harris,* 278 Ky. 218, 128 S.W. 2d 579; *LaPlante* v. *State Board,* 47 R.I. 258, 131 Atl. 641; *Commonwealth* v. *Funk,* 323 Pa. 390, 186 Atl. 65; *Prichard* v. *Battle,* 178 Va. 455, 17 S.E. 2d 393.) That such provisions generally aim to foster public safety, while the primary bearing, at least, of the present provision is the protection of the highways from abuse by excessively heavy loads, cannot be a material difference. Plaintiff would also distinguish these cases on the ground that the suspension here "is directed precisely to a prohibition upon the right to engage in a lawful business." But one who uses the public highways for the conduct of his business certainly cannot on that account claim a preferred position. *Bode* v. *Barrett,* 412 Ill. 204; *Weksler* v. *Collins,* 317 Ill. 132.

Plaintiff, however, asserts that that portion of section 132.02(g) which requires the court to consider evidence relating to the character and gravity of the violations and the extent of the operations of the defendant in determining whether there has been habitual operation in violation of the act fails to provide a "reasonable ascertainable standard" and therefore violates both due process and the separation of powers required by article III of the constitution of Illinois. Insofar as the suspension provision is conditioned upon the occurrence of a statutory offense, there is, of course, no question of indefiniteness, for the statutory maximum weight and load limits are expressed in precise units of physical measurement. But it is argued that the terms "character" and "gravity" lack precision, and that they afford no standard by which an operator who has been convicted of a violation of a statutory load limit can tell whether that violation falls "within or without the type of violation for which an operator's privilege may be

suspended." As to the factor of "extent of operations," which the plaintiff describes as the "percentage relationship of violations to nonviolations," it is said that no measure is prescribed for either the court "or the operator to adjudge or determine that distinctive percentage which falls within the prohibited category, and that which falls without it." In support of this argument plaintiff relies upon *Connally* v. *General Construction Co.* 269 U.S. 385; *Small Company* v. *American Sugar Refining Co.* 267 U.S. 233; *United States* v. *Capital Traction Co.* 34 App. D.C. 592, and other cases in which statutes have been invalidated for want of definiteness.

Neither proposition is sound. It may be conceded, as the plaintiff suggests, that the standards provided do not permit an operator to know in advance whether or not his conduct, admittedly in violation of the law, will be determined to warrant a finding that he has habitually operated in violation of the act with resulting suspension. From the point of view of the operator it would obviously be desirable to know the precise conditions under which he may violate the law without incurring the risk of suspension of his license. But the desire of the operator is not equivalent to a command of the constitution. Many years ago it was pointed out that "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." Mr. Justice Holmes in *Nash* v. *United States,* 229 U.S. 373, 377.

The General Assembly is not required to establish an absolute criterion for the revocation of this privilege. It may concern itself with the quality of the conduct which is the basis of revocation. It might express that concern by attempting to enumerate all the conditions of weather, roads, and loads, and the myriad of transitory circumstances peculiar to the business of the offending carrier or to the offense which might be relevant by way of excuse or justi-

fication. But no constitutional provision requires it to do so as long as intelligible standards are established to be applied by the agency to which the determination is committed.

While the standards here fixed are expressed in general terms, they deal unmistakably with the quality of the conduct which is made the basis of suspension of the privilege. They include factors relating to the deliberate, negligent, or excusable quality of the violations which are relied upon as a basis for revocation. In this we see no constitutional defect.

The plaintiff also contends that the determination of whether or not there has been operation in habitual violation, and hence of whether or not the privilege to operate should be suspended, is so inherently an administrative function that it cannot, under article III of the constitution, be committed to a court. In support of this argument plaintiff relies on *Borreson v. Department of Public Welfare*, 368 Ill. 425. The statute in that case required the court, on an appeal from an administrative agency, to determine *de novo* the amount to be paid to aged persons for old-age assistance, and it was held that the function was administrative, and could not validly be committed to a court. The determinations involved in the present case, however, are of the kind which have traditionally been considered judicial. The application of generalized standards—negligence, malice, fraud, and a host of others—to particular conduct was the routine business of the courts long before administrative agencies, as we know them now, came into existence. The issues in a suspension proceeding bear a marked resemblance to the issues which courts decide daily in the administration, for example, of statutes providing for probation and indeterminate sentences. And since the procedure in suspension proceedings is governed by the Civil Practice Act, and an order of suspension is enforceable by contempt, the analogy to injunction is obvious. We

hold, therefore, that section 132.02 does not violate the provisions of article III.

Plaintiff also attacks the provision that proof of ten or more convictions for violation of the load limits within twelve months shall constitute *prima facie* evidence of habitual operation in violation of the act. It is contended that this provision discriminates unreasonably against one who operates numerous vehicles on frequent trips and in favor of one who operates fewer vehicles and less frequently. Because a *prima facie* case of habitual operation in violation of the statute may be established against operators whose ratio of unlawful to lawful operations is substantially different, it is urged that the statute creates a discrimination which is invalid under the equal-protection clause of the fourteenth amendment.

The argument is not impressive. We are aware of no constitutional provision which would invalidate an absolute rule of suspension for specified violations. Provisions for the suspension or revocation of drivers' licenses for specified violations of law are commonplace. And the fact that these provisions do not take into account the number of miles driven by the respective violators has not, so far as we are aware, been thought to invalidate them. Plaintiff's argument does no more than underscore the wisdom of the authorized inquiry into the circumstances of the violations, an inquiry which the plaintiff elsewhere in its argument so vigorously attacks.

Plaintiff next argues that the *prima facie* test violates due process because an operator may be faced with the burden of defending against a succession of suspension proceedings involving identical violations. It is suggested that an operator who has ten or more violations during a twelve-month period may be found, in view of all the circumstances, not to have operated in habitual violation of the law. Upon further convictions for violation of the

load limits during the same twelve-month period, a second action under section 132.02 might be instituted and might result in the suspension of such an operator's privilege. The second suspension proceeding is occasioned, however, by the operator's continued conduct, which results in additional violations. Since these additional convictions tend to cast new light on the overall character of his operations, a re-examination of the charge of habitual violation is justified, and in such a re-examination there is no deprivation of due process.

It is also contended that the statute is fatally unreasonable in that it permits inclusion, in the ten offenses which make up a *prima facie* case, of violations due to "axle overloads," which may have been unavoidable. The argument is based upon the fact that section 131 recognizes a category of "unavoidable" axle overloads which are punished by a nominal fine of one dollar. Apart from the fact that the complaint does not allege that any of the violations with which plaintiff is charged are of this character, the contention must fail. There is no basis for assuming that any court would refuse, in a suspension proceeding, to take into account a previous judicial determination that abnormal and unanticipated conditions made it impossible to prevent undue shifting of a particular load. Indeed, such a circumstance would seem to be peculiarly within the authorized scope of inquiry into the "character" of the violation.

It is said that the penalty of suspension of operating privileges is so disproportionate to the offense as to deprive the plaintiff of due process of law and to contravene section 11 of article II of the constitution of Illinois which provides: "All penalties shall be proportioned to the nature of the offense * * *." We do not agree. The State's continuing search for effective enforcement techniques to secure compliance with valid weight limits is apparent in the legislation dealing with the subject. (See: Act of July 9, 1935, secs. 132, 135, 137, Laws of 1935, p. 1281 ff.;

Act of August 6, 1949, secs. 1, 2, 3, Laws of 1949, p. 1142; Act of August 10, 1949, secs. 132, 132.01, Laws of 1949, p. 1156; Act of August 6, 1951, sec. 132.01, Laws of 1951, p. 2090.) The General Assembly might infer that the truckers find the payment of statutory penalties when violation is established to be economically preferable to compliance. But the State is entitled to insist upon compliance with its valid regulations, and to shape its penalties to that end. Considerations stemming from the commerce clause of the Federal constitution apart, we see no reason why the State may not restrict the privilege of using its highways for profit to those who comply with its laws. If, because of the peculiarities of a particular load, compliance would present inordinate difficulties, provision is made for a permit to exceed the statutory limits. Ill. Rev. Stat. 1951, chap. 95½, par. 230.

We think the sanction imposed here is not disproportionate to the offense. We have previously sustained acts which impose analogous auxiliary penalties such as the confiscation of a vehicle or prohibition of the use of a building, (*People* v. *Kawoleski,* 310 Ill. 498,) as well as acts imposing progressively severer penalties for repeated offenses. (*Kelly* v. *People,* 115 Ill. 583.) *Chicago and Alton Railroad Co.* v. *People ex rel. Koerner,* 67 Ill. 11, on which plaintiff relies, is not authority to the contrary, for we recognized there the propriety of forfeiture in cases of successive violations.

Plaintiff's final contention is that the suspension provisions are invalid under the commerce clause and the supremacy clause of the Federal constitution. While it is conceded that the State has broad powers over the use of its highways in interstate commerce, it is argued that the power of the State does not include the suspension, even for a limited period of time, of the right to engage in interstate commerce, in the case of carriers who hold certificates of convenience and necessity under the Federal

Motor Carrier Act. Because the issue presented lies within a sensitive area of State and Federal relations, we have carefully examined the statute to be sure that it was intended to apply to interstate commerce. Its scope is fixed by the definition of "commercial vehicle operator's privilege" as "the privilege recognized or conferred by any law of this state * * * to operate * * * commercial vehicles * * * upon the public highways of this state." A privilege or right to operate motor vehicles for commercial purposes in interstate commerce is clearly recognized in other statutes. (Ill. Rev. Stat. 1951, chap. 95½, par. 220.13, par. 243.) From this fact, and from the fact that section 132.02 does not itself suggest any exemption of the operators engaged in interstate commerce, we conclude that the suspension procedure was intended to apply to all operators whether engaged in interstate or intrastate commerce.

So construing the statute, we meet the contention that the commerce and supremacy clauses of the Federal constitution prevent the State from suspending the right to use its highways in the case of an interstate trucker who operates pursuant to a certificate of convenience and necessity from the Interstate Commerce Commission. On this issue, we find no controlling authority which is precisely in point.

The power of the State over those who use its highways in interstate commerce is extensive. It may prescribe the maximum size and weight of vehicles engaged in interstate commerce, (*South Carolina State Highway Dept.* v. *Barnwell Bros.* 303 U.S. 177,) it may regulate their design, (*Maurer* v. *Hamilton,* 309 U.S. 598,) and it may impose nondiscriminatory fees. (*Hendrick* v. *Maryland,* 235 U.S. 610; *Kane* v. *New Jersey,* 242 U.S. 160.) Before Federal regulation of interstate motor carriers became effective, the power of the States to suspend or revoke authority to engage in interstate commerce, as a sanction for the en-

forcement of State statutes regulating the use of the highways, was sustained. (*Welch Co.* v. *New Hampshire,* 306 U.S. 79; *Eichholz* v. *Public Service Com.* 306 U.S. 268; cf. *Detroit-Cincinnati Coach Line* v. *Public Utilities Com.* 119 Ohio St. 324, 164 N.E. 356.) More recently, State statutes which provided for revocation as a means of enforcing the collection of taxes have been sustained without discussion of the propriety of the sanction. (*Aero Mayflower Transit Co.* v. *Board of Railroad Comrs.* 332 U.S. 495; *Capitol Greyhound Lines* v. *Brice,* 339 U.S. 542.) In *Joyner* v. *Matthews,* 193 Va. 10, 68 S.E. 2d 127, the Virginia court upheld a statute which provided for suspension of the right to operate in interstate commerce for failure to pay amounts which had become due to the State by reason of violations of weight limits. The court noted, however, that suspension was there employed merely as a means of enforcing the payment of amounts due, saying, "So long as the violation is paid for at the rate fixed * * * he can continue to operate." 193 Va. at p. 15.

On the other hand, sanctions of the type here involved have frequently been invalidated under the commerce clause, even though the regulation to which the sanction attached was within the power of the State. So it has been held that payment of a tax otherwise valid may not be made a condition precedent to the right to carry on interstate business, but that enforcement must be left to ordinary collection procedures. (*Western Union Telegraph Co.* v. *Massachusetts,* 125 U.S. 530.) Nor may nonpayment of an otherwise valid tax be made the basis of the forfeiture of a corporate franchise to engage in interstate commerce. (*St. Louis Southwestern Railway Co.* v. *Arkansas,* 235 U.S. 350.) In *Hill* v. *Florida,* 325 U.S. 538, a union business agent who failed to secure a license required by State law was enjoined from acting as a business agent. The court held that his right to act in that capacity was conferred by the National Labor Relations Act, and that the right so granted could not be

obstructed by injunction or by penalty for acting without a license. "It is the sanction here imposed, and not the duty to report, which brings about a situation inconsistent with the federally protected process of collective bargaining." 325 U.S. 538, 543.

Both *Welch Co.* v. *New Hampshire*, 306 U.S. 79, and *Eichholz* v. *Public Service Com.* 306 U.S. 268, which, as noted, sustained sanctions by way of suspension or revocation in the field of highway regulation, strongly suggested that this power of the State would be superseded when the Federal Motor Vehicle Act became effective. (306 U.S. at pp. 84 and 273.) The Supreme Court of Texas, in *Railroad Commission of Texas* v. *Querner*, 150 Tex. 490, 242 S.W. 2d 166, held that since control over this aspect of interstate commerce has been asserted by the Federal Motor Carrier Act, the sanction of revocation cannot be applied to an interstate trucker for violation of a valid State statute, although the opinion intimates that a different rule might be applied if the violation related to public safety or damage to the highways.

None of these determinations appears to us to be conclusive. It is true that the statute here involved applies without discrimination to interstate and intrastate carriers, and that the conduct with which it is concerned, the regulation of load limits upon the highways, is a matter of vital local concern and one which Congress has left open to regulation by the States. On the other hand, Congress has legislated in this field "to the end of developing, coordinating and preserving a national transportation system of water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense." 54 Stat. 899, 49 U.S.C., note preceding sec. 301.

Weighing the effect of the State action in this case against the announced purpose of Congress, we are of the

opinion that the statute is invalid to the extent that it provides for suspension of the right to engage in interstate commerce upon the highways of the State. In the interest of establishing a national transportation system, the Federal government has granted the plaintiff the right to engage in commerce upon the highways of Illinois. That is the very right which is to be suspended under section 132.02. A Federal certificate of convenience and necessity to engage in interstate commerce does not, of course, imply immunity from the payment of taxes and other valid financial obligations. And so it may be that suspension for failure to meet obligations of that kind stands upon a different footing. But we do not see how an adequate national transportation system can be maintained if the comprehensive transportation network which it contemplates is to be subject to disruption by State suspension of operating rights for violation of load limits or other traffic regulations.

The fact that the Federally granted right of an operator to engage in interstate commerce cannot be suspended does not, however, impair the validity of section 132.02 as applied to intrastate operations. The continuing power of the State over those operations is expressly recognized by Congress. (49 U.S.C. sec. 302(b).) The statute can operate effectively if its application is restricted to intrastate commerce. And even apart from the separability clause of the statute, (Ill. Rev. Stat. 1951, chap. 95½, par. 239,) section 132.02 itself indicates the intention of the General Assembly to exert the full measure of its constitutional power to secure compliance with its valid regulations.

It follows that the decree of the circuit court must be reversed, and the cause remanded, with directions to enter a decree in accordance with this opinion.

*Reversed and remanded, with directions.*